[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13787
_____

D.C. Docket No. 0:16-cv-61289-CMA


BROWARD BULLDOG, INC.,
a Florida not-for-profit corporation,
DAN CHRISTENSEN,
founder, operator, and editor of the BrowardBulldog.com website,

Plaintiffs-Appellants
Cross Appellees,

versus

U.S. DEPARTMENT OF JUSTICE,
FEDERAL BUREAU OF INVESTIGATION,

Defendants-Appellees
Cross Appellants.


_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(September 23, 2019)

Before WILLIAM PRYOR, MARTIN, and JORDAN, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

This appeal involves two requests for documents under the Freedom of Information Act, 5 U.S.C. § 552. In 2015, Broward Bulldog, Inc., a newspaper published in Florida, requested that the Federal Bureau of Investigation disclose documents reviewed by the 9/11 Review Commission. Broward Bulldog and its founder, Dan Christensen, contend that the Bureau has concealed a connection between the terrorists responsible for the attacks on September 11, 2001, and a Saudi family that lived in Florida. In response, the government disclosed hundreds of documents but redacted some information as falling within statutory exemptions, *id.* § 552(b)(1)–(9). Broward Bulldog challenged several redactions and argued that the Bureau failed to conduct an adequate search. In a thorough opinion, the district court granted summary judgment in favor of the government for most of the redactions, but ordered the government to disclose personal information redacted under Exemptions 6 and 7(C), as well as confidential-source information redacted under Exemption 7(D). Broward Bulldog and Christensen raise several challenges to the redactions, and the government cross-appeals the disclosures ordered by the district court. We conclude that, with the exception of its rulings regarding redactions under Exemptions 7(C), 7(D), and 7(E), the district court did not err. We affirm in part, reverse in part, and remand.

2

## I. BACKGROUND

For years, Dan Christensen, the founder of a newspaper named Broward Bulldog, Inc., has doggedly maintained that a Saudi Arabian family that lived in Sarasota, Florida, had "troubling ties" with the hijackers responsible for the terrorist attacks on September 11, 2001. In 2011, Broward Bulldog published an article that stated that members of the family "abruptly left their luxury home" two weeks before the attacks, that they had contact with the hijackers, and that the Federal Bureau of Investigation investigated the family but failed to report the investigation to Congress. The Bureau immediately admitted in a press release that it investigated the family, but it denied that it found any connection between the family and the attacks.

Undeterred, in 2011 Broward Bulldog filed a request under the Freedom of Information Act for "records regarding the investigation of the family," and it sued the Bureau and the Department of Justice to compel a response. The Bureau disclosed many responsive documents, including a 2002 "Electronic Communication" by a Bureau agent. The agent stated that "[f]urther investigation of the . . . family revealed many connections between the [family] and individuals associated with the terrorist attacks on 09/11/2001." The district court in that litigation recently issued an opinion resolving Broward Bulldog's challenge, although it has not entered a final judgment. *See Broward Bulldog, Inc. v. U.S.*

3

*Dep't of Justice* (*Broward Bulldog I*), No. 12-cv-61735-WJZ (S.D. Fla. Aug. 22, 2019).

A few years later, in 2014, Congress directed the Bureau to create a 9/11 Review Commission, also known as the Meese Commission, to review the implementation of recommendations made by an earlier commission. The Meese Commission reviewed the investigation of the Saudi family and concluded that "[t]he allegations that the family was connected to the hijackers and/or the 9/11 plot were not substantiated" and that the press accounts "were based on inaccurate information and a poorly written and innaccurate [sic] [electronic communication]."

Broward Bulldog filed two more requests for information in 2015. One request sought information reviewed by the Meese Commission, and the other asked for specific documents associated with the Commission. In June 2016, Broward Bulldog again sued the Bureau and the Department of Justice to compel a response to its requests.

The Bureau produced many documents in response to the requests. It first released 896 pages of records that it located in an "electronic storage site" for Commission records. It then released a few additional documents that it had mistakenly withheld, and it disclosed two names that it had previously redacted.

4

Finally, in response to informal inquiries from Broward Bulldog, the Bureau searched a few other locations and disclosed several other records.

While the Bureau performed these additional searches, the government moved for summary judgment or moved to supplement a pending motion for summary judgment three times. In support of its motions, the government submitted a variety of public and sealed documents. It submitted public declarations by David Hardy, the section chief of the Record/Information Dissemination Section of the Records Management Division of the Bureau. It submitted sealed *ex parte* charts called *Vaughn* indices, *see Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), that linked blocks of redacted text to the justifications for any exemptions asserted. And it submitted sealed copies of all the responsive documents for *in camera* review.

Broward Bulldog sought to depose Jacqueline McGuire, the Bureau agent who briefed the Commission, and the district court referred the matter to a magistrate judge. Broward Bulldog sought to depose McGuire to determine "the basis for her assertion that the . . . 'many connections' memo was wholly unsubstantiated." According to Broward Bulldog, if she admitted that she had no basis for the assertion, then it could "establish the bad faith of the [Bureau]," and a finding of bad faith would, in turn, support its argument that the Bureau is "now asserting exemptions to disguise what [it] found, which was substantial Saudi

5

support for the 9/11 attacks." But Broward Bulldog agreed with the magistrate judge that "to get discovery [it had] to show [the government's] bad faith" in its disclosure, and Broward Bulldog repeatedly asserted that it had established the government's bad faith.

The magistrate judge denied the motion. He explained that Broward Bulldog had not established that the government acted in bad faith in its disclosures and that Broward Bulldog was trying to prove that "the [Bureau] had bad faith in the way [it] conducted th[e] underlying investigation, not whether or not the [Bureau] ha[d] bad faith in classifying and disclosing documents." And it stated that, in any event, McGuire "would have no information in regards to . . . whether or not something was properly exempted . . . or whether or not the [Bureau] did a proper search, because . . . there's no evidence that she was involved in that process at all."

In an objection to this order, Broward Bulldog argued that the magistrate judge applied the wrong standard for proving the government's bad faith. But the district court ruled that Broward Bulldog invited this error when it "agreed with [the magistrate judge that] the correct legal standard" to obtain discovery required a showing of bad faith by the government in its responses to the requests for documents. So it "decline[d] to review on appeal a discovery issue that was not properly presented to [the magistrate judge]."

6

The district court issued three orders to resolve a long list of merits disputes about the adequacy of the search by the Bureau and the applicability of different exemptions to different documents. It ruled that Hardy's declarations established that the Bureau conducted an adequate search. It explained that "the law only requires [a] search be reasonable, not exhaustive" and that the declarations were "sufficiently detailed and non-conclusory, describing every step the [Bureau] took to identify responsive records." It also explained that the "conclusory" accusations by Broward Bulldog that the Bureau was "act[ing] in bad faith . . . [we]re insufficient" to bar summary judgment for the government.

The district court approved several, but not all, of the redactions. It upheld the redactions made under Exemptions 1 and 3, which protect, among other things, national security information. *See* 5 U.S.C. §§ 552(b)(1), (b)(3). It reasoned that "[w]hile the burden of proof is on the [g]overnment, a reviewing court must recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse [e]ffects . . . might occur as a result of public disclosure of a particular classified record." And it ruled that the government had satisfied its burden under that standard. Although Broward Bulldog never moved for summary judgment, the district court also ordered the government to disclose all but two blocks of texts redacted under Exemptions 6 and 7(C), which protect information that implicates personal privacy

7

rights. *See id.* §§ 552(b)(6), (b)(7)(C). The district court largely upheld the redactions of confidential-source information under Exemption 7(D), *see id.* § 552(b)(7)(D), though it ordered the government to disclose information in document 27 that it had redacted under that exemption. It upheld all the redactions made under Exemption 5, *see id.* § 552(b)(5), which protects the deliberative processes of an agency. And although the district court initially ruled that the government had to disclose some of the text that the Bureau redacted as disclosing law-enforcement techniques and procedures, it later granted a motion for reconsideration and upheld all the redactions made under Exemption 7(E). *See id.* § 552(b)(7)(E). Finally, the district court refused to "consider the records produced in *Broward Bulldog I*," even though some of those records could be responsive to the requests at issue. It explained that considering the records "could potentially result in inconsistent findings in the two actions."

## II. STANDARD OF REVIEW

"This [C]ourt reviews a district court's grant of summary judgment in a . . . case [under the Act] *de novo*, viewing all facts and reasonable inferences in the light most favorable to the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008).

8

### III. DISCUSSION

The Freedom of Information Act codified "a strong public policy in favor of public access to information in the possession of federal agencies." *News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1190 (11th Cir. 2007) (citation and internal quotation marks omitted). The Act requires that "each [federal] agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . , shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). After an agency receives a request for records, it may withhold information from responsive documents only if it falls within one of nine statutory exemptions. *See Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). Because "[t]he purpose of [the Act] is to encourage public disclosure of information," responsive documents "are presumed to be subject to disclosure unless [an agency] affirmatively establishes that the requested records fall into one of [the] exemptions." *Office of Capital Collateral Counsel v. Dep't of Justice*, 331 F.3d 799, 802 (11th Cir. 2003). But the Act also "expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of [the Act's] purposes and policies as [its] disclosure requirement." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (alterations, adopted) (internal quotation marks omitted).

Our review consists of three parts. At the outset, we review whether the agency established "beyond a material doubt" that it "conducted a search reasonably calculated to uncover all relevant documents." *Miccosukee Tribe*, 516 F.3d at 1248 (quoting *Ray v. U.S. Dep't of Justice*, 908 F.2d 1549, 1558 (11th Cir. 1990), *rev'd on other grounds* 502 U.S. 164 (1991)). We next determine "whether the district court had an adequate factual basis for the decision rendered," and then determine whether the district court erred when it ruled on the applicability of each exemption. *Id.* at 1258.

We divide our discussion in six parts. First, we explain that the Bureau established that it performed an adequate search. Second, we explain that the district court had an adequate factual basis to render a decision. Third, we explain that Broward Bulldog has abandoned its challenge of the denial of its request to depose Agent McGuire. Fourth, we explain that the district court did not err in most of its rulings on the applicable exemptions. Fifth, we explain that the district court did not err when it failed to make express findings of segregability. Sixth, we explain that the district court did not err when it refused to entertain a request for documents that were already the subject of a separate, nearly identical lawsuit.

   A.  *The Bureau Established that It Performed an Adequate Search.*

To establish the adequacy of a search for responsive documents, a government agency "must show beyond a material doubt . . . that it has conducted

10

a search reasonably calculated to uncover all relevant documents." *Id.* at 1248 (alteration in original) (citation and internal quotation marks omitted). The agency "may meet this burden by producing affidavits of responsible officials 'so long as the affidavits are relatively detailed, nonconclusory, and submitted in good faith.'" *Ray*, 908 F.2d at 1558 (quoting *Miller v. U.S. Dep't of State*, 779 F.2d 1378, 1383 (8th Cir. 1985)). If the agency satisfies this burden, "then the burden shifts to the requester to rebut the agency's evidence by showing that the search was not reasonable or was not conducted in good faith." *Id.*; *see also Karantsalis v. U.S. Dep't of Justice*, 635 F.3d 497, 500–01 (11th Cir. 2011).

Because "[t]he standard is one of reasonableness," the Act "does not require an agency to exhaust all files which conceivably could contain relevant information." *Ray*, 908 F.2d at 1558–59. So a requester cannot rebut a showing of an adequate search by arguing that he received only a subset of the documents that he thought existed. *See id.* at 1559 ("The plaintiffs' emphasis o[n] a particular reference to 582 interviews, while they received information regarding only 384 interviews, is not enough to rebut the government's showing of an adequate search."). The agency "is not required . . . to account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found." *Id.* (quoting *Miller*, 779 F.2d at 1385) ("[I]t is not necessary to create a document that does not

11

exist in order to satisfy a . . . request[er]." (internal quotation marks omitted)). And the "late production" of documents does not necessarily create an "adverse" inference. *Miccosukee Tribe*, 516 F.3d at 1257. Instead, we must "evaluate the reasoning behind the delay" to determine "what inference, if any, can be or should be drawn." *Id.*

The Bureau satisfied its burden by submitting declarations that were "relatively detailed, nonconclusory, and submitted in good faith." *Ray*, 908 F.2d at 1558 (quoting *Miller*, 779 F.2d at 1383). Hardy, the section chief of the Record/Information Dissemination Section of the Records Management Division of the Bureau, attested in his fifth declaration that employees of his Section reasonably believed that all responsive documents would be located in an "electronic storage site" associated with the Office of the Director. He explained that employees of the Section contacted the Office and declined to search the central records system, which houses investigative information, because Broward Bulldog "sought specific documents relating to the 9/11 Commission Report, and not investigative records." Section employees provided a copy of the request to two Office employees who served as liaisons to the Commission; the two employees provided the Section employees with access to the "electronic storage site" for the Commission; and they did not direct the Section employees to look elsewhere because they "believed this electronic storage [site] contained all the

12

9[/]11-Commission records [Broward Bulldog was] seeking." The Section employees then performed a "document-by-document search of all records on the site" and identified over 800 pages of responsive records. They did not identify any "leads to other locations where responsive records may have been maintained," so they "concluded that additional searches were not warranted."

In response to inquiries from Broward Bulldog about specific missing documents, the employees again corresponded with the Office employees. The Office employees informed the Section employees, for the first time, of an electronic file associated with the Commission and stored on the central records system. The Office employees told the Section employees that they failed to disclose this file earlier because they "believed all the information sought . . . was housed in the electronic storage site." The Section employees then performed a "document by document search of all [of the] contents" of the electronic file. All of the responsive documents were duplicates of the Commission records previously found on the storage site maintained by the Office. During their correspondence with the Section employees, the two Office employees also "mentioned the existence at some point of additional records they believed to be destroyed" because the documents were sent to the Records Storage and Maintenance Unit, which was expected to maintain the documents for a year before destroying them. The Section employees retrieved the documents, which had not yet been destroyed,

13

performed a "document-by-document search," and processed the responsive documents for release.

Broward Bulldog argues that Hardy's declaration failed to describe an adequate search. It points out that Hardy failed to identify "the search terms the [Bureau] used." But Hardy did not identify any search terms because the Section employees performed a "document-by-document search" of the electronic storage site, the electronic file located on the central records system, and the Commission documents sent to the Records Storage and Maintenance Unit. And contrary to the argument of Broward Bulldog, Hardy's declaration explained the basis for the conclusion that responsive documents would not be located on the central records system and why the Section employees relied on the Office employees to guide their search. It was reasonable to decide not to search the central records system because that system is indexed by "subjects of investigative interest," and Broward Bulldog sought the working papers of the Commission—which are not investigative records. It made sense to rely instead on the personal knowledge of two Office employees who served as liaisons to the Commission to identify where responsive documents would be. Indeed, the file the Section employees ultimately located on the central records system contained only duplicates of the records found on the storage site the Office employees initially identified.

14

Broward Bulldog stresses that the Bureau did not identify the persons in the Director's Office who searched for documents, but this omission is irrelevant. After all, the Office employees performed no search. They instead identified the locations that the Section employees searched. In any event, Hardy explained that the Office employees were "liaisons to the Commission, who were directly involved with" the work of the Commission. And there is "no general requirement for an agency to disclose the identity and background of the actual persons who process [Freedom of Information Act] requests." *Maynard v. Cent. Intelligence Agency*, 986 F.2d 547, 563 (1st Cir. 1993).

Broward Bulldog has failed to rebut the Bureau's evidence that it conducted an adequate search. It argues that the "failure [of the Bureau] to respond to [its] requests in a timely fashion raised doubts in the context of this case," and it contends that the "sole" explanation for the delay "was that 'unusual circumstances' prevented a timely production of records." To be sure, the late production of documents *may* support an "adverse" inference if the agency fails to produce a reasonable explanation for the delay. *See Miccosukee Tribe*, 516 F.3d at 1257. But no adverse inference is warranted here. The district court explained that the Bureau was initially delayed in processing the request "due to an overwhelming[ly] large backlog of pending . . . requests and litigation" under the

15

Act. And the government's failure to meet the statutory deadlines does not support an inference that it was acting nefariously, in any event.

Broward Bulldog complains that the Bureau released "piecemeal" batches of documents "on the eve of important deadlines, like the deadlines for summary judgment motions and trial," but as the district court explained, Broward Bulldog has offered nothing beyond speculation to support its assertion that the Bureau sought "strategic advantage" by manipulating when it produced responsive documents. Although the Bureau did not "exhaust all files which conceivably could contain relevant information" when it first responded to the request, *Ray*, 908 F.2d at 1558–59, it did not have to do so. The initial search, together with the continued efforts of the Bureau to provide responsive documents, satisfied the burden to "conduct[] a search reasonably calculated to uncover all relevant documents." *Id.* at 1558 (citation and internal quotation marks omitted); *see also Miccosukee Tribe*, 516 F.3d at 1256–57 (refusing to draw an "adverse" inference even though "some *de minim*[*i*]*s* number of documents were overlooked in the initial . . . search"). And we agree with the government that if we were to hold that a later production of documents means that any initial search was inadequate, we would effectively tell agencies not to perform any additional searches in response to further inquiries.

16

Broward Bulldog also argues that the Bureau failed to produce certain documents, like transcripts of Commission interviews, but there is no evidence that these documents exist in the first place. The Bureau "is not required . . . to account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found." *Ray*, 908 F.2d at 1559 (quoting *Miller*, 779 F.2d at 1385). The Bureau pursued all the leads it had, Broward Bulldog identified no other locations for the Bureau to search, and Broward Bulldog offered no persuasive evidence that the alleged documents even exist.

The amici newspapers argue that Broward Bulldog was "precluded" from identifying missing documents because the government filed its first motion for summary judgment before the Bureau completed its search, but in its briefs before this Court, filed well after the Bureau completed its search, Broward Bulldog offers no evidence that the transcripts exist. Broward Bulldog points only to the Federal Advisory Committee Act, 5 U.S.C. app. 2, § 11(a), which it argues requires agencies to make transcripts of advisory committee meetings available to the public. Even assuming this law applies to the Commission, it would, at most, prove that the Commission *should* have kept transcripts of its meetings, but we fail to see how it proves that the transcripts Broward Bulldog seeks *actually* exist. Mere speculation is not enough to rebut the showing by the Bureau. *See Ray*, 908

17

F.2d at 1559 ("[I]t is not necessary to create a document that does not exist in order to satisfy a . . . request[er]." (citation and internal quotation marks omitted)).

### B. *The District Court Had an Adequate Factual Basis to Render a Decision.*

Broward Bulldog argues that the government failed to offer detailed declarations to satisfy its burden to justify the exemptions it asserted. And it adds that the district court failed to create a robust public record. We disagree.

We review whether the district court "had an adequate factual basis for the decision rendered." *Miccosukee Tribe*, 516 F.3d at 1258. We have held that an adequate factual basis can "be provided through a singular method—such as affidavits, a *Vaughn* Index, or an *in camera* review, *or* a combination of these methods." *Id.* at 1259. When a district court relies on declarations or *Vaughn* indices, these documents are adequate if they supply "relatively detailed justification[s], specifically identifying the reasons why a particular exemption is relevant and correlating those claims with [a] particular part of a withheld document." *Id.* at 1258 (citation and internal quotation marks omitted).

We have also held that a district court has the discretion to conduct an *in camera* review of the documents to determine whether the exemptions apply. *Id.* But we have added that, because *in camera* review "undercuts the traditional adversarial theory of judicial dispute resolution," *Currie v. Internal Rev. Serv.*, 704 F.2d 523, 530 (11th Cir. 1983) (quoting *Mead Data Ctr., Inc. v. U.S. Dep't of the*

18

*Air Force*, 566 F.2d 242, 250 (D.C. Cir. 1977)), a district court "should attempt to create as complete a public record as is possible" before it resorts to *in camera* review, *Ely v. Fed. Bureau of Investigation*, 781 F.2d 1487, 1493 (11th Cir. 1986) (quoting *Phillippi v. Cent. Intelligence Agency*, 546 F.2d 1009, 1013 (D.C. Cir. 1976)). And *in camera* review should be used "in only the rare case such as . . . where the disputed documents are relatively brief, few in number, and where there are few claimed exemptions." *Currie*, 704 F.2d at 531.

The district court rendered its decision after reviewing several declarations and three sealed *Vaughn* indices and after conducting an *in camera* review of the documents. The declarations and *Vaughn* indices provided "relatively detailed justification[s], specifically identifying the reasons why a particular exemption [wa]s relevant and correlating those claims with [a] particular part of a withheld document." *Miccosukee Tribe*, 516 F.3d at 1258. For example, the Bureau explains that it redacted text in document 2 under Exemption 5 because it revealed "preliminary recommendations on [Bureau] policies that have not been implemented." And the redacted text—two sentences under the heading "Gaps/Possible Issues/Recommendations"—contains a specific preliminary recommendation about how the Bureau should conduct future interviews. Similarly, the government explains that it redacted text from document 5 under the attorney-work-product privilege codified in Exemption 5 because the text revealed

19

"attorneys' strategies and assessments in anticipation of litigation," including "the thoughts, strategies, and opinions of [Civil] Division attorneys handling the [relevant] matters." The redacted text concerns specific plans that Department of Justice attorneys had about several civil cases. These examples highlight how, throughout its *Vaughn* indices and the supporting declarations, the government disclosed "as much information in the withheld documents as possible without waiving the privilege." *Miccosukee Tribe*, 516 F.3d at 1261 (internal quotation marks omitted). And "it is fair to say that both [Broward Bulldog] and the district court were able to understand why each document or portion of a document was withheld as exempt from disclosure, even without the *in camera* review," and that these documents provided an adequate basis for the decision rendered. *Id.*

Broward Bulldog argues that the justifications offered by the government were inadequate because they contained "boilerplate language," but we have never suggested that an agency may not use similar language to justify withholding information in multiple documents. After all, "[t]here are only so many ways" an agency can claim the same exemption for related documents. *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 147 (D.C. Cir. 2006) ("No rule of law precludes [an agency] from treating common documents commonly."). As the District of Columbia Circuit explained in *Larson v. Department of State*, "an agency's response must logically fit the particular facts and circumstances of the

20

case . . . but the fact that similar exemption explanations . . . suit similar cases . . . is not a cause for further judicial inquiry." 565 F.3d 857, 868 (D.C. Cir. 2009).

In addition, *in camera* review ensured that the district court had an adequate factual basis to render a decision. It is "rare" for the government to provide *Vaughn* indices, declarations, *and* the relevant documents for *in camera* review. *Miccosukee Tribe*, 516 F.3d at 1259. But the government provided all three, including sealed *Vaughn* indices that provide more specific explanations than those that are in its public submissions. And in *Currie*, we were satisfied that the district court had a sufficient factual basis when the government submitted allegedly "conclusory affidavits" as well as the disputed documents for *in camera* review. 704 F.2d at 530. So the district court had a "more than an adequate basis for determining the propriety of the exemption[s]" asserted here. *Miccosukee Tribe*, 516 F.3d at 1261.

On a final note, Broward Bulldog suggests that we must determine whether the government made redactions in bad faith, but we disagree. Broward Bulldog cites no decision that supports its proposal to require agencies to meet a requirement of good faith before asserting a statutory exemption that would otherwise apply. When reviewing courts consider good faith, they do so to determine only whether to credit agency affidavits detailing the reasons why an exemption applies or why a search was adequate. *See, e.g.*, *Judicial Watch, Inc. v.*

21

*U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) ("[S]ummary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." (citation and internal quotation marks omitted)). They do not refuse to apply an otherwise applicable exemption because the agency may not have been motivated solely by whatever purpose motivated Congress to create the exemption. *See, e.g.*, *Rimmer v. Holder*, 700 F.3d 246, 258 n.5 (6th Cir. 2012) (explaining that the "discussion of agency bad faith [in another decision] was brought up in the context of whether the agency should be required to submit its records to the district court for an *in camera* review, and had nothing to do with the actual applicability of . . . exemptions" (citation omitted)).

## C. *Broward Bulldog Has Abandoned Its Challenge Related to Its Request to Depose Agent McGuire.*

Broward Bulldog argues that the district court erred in denying its request to depose McGuire, the Bureau agent who briefed the Commission on the Sarasota investigation, but it has failed to challenge the determination by the district court that the alleged error was invited. The district court explained that Broward Bulldog could not argue that the magistrate judge erred when he required it to prove the government's bad faith in its disclosures to depose McGuire because Broward Bulldog had "agreed with [the magistrate judge that that was] the correct

22

legal standard." And the district court "declin[ed] to review on appeal a discovery issue that was not properly presented to [the magistrate judge]." To obtain a reversal of that ruling, Broward Bulldog "must convince us that every stated ground for the [ruling] against [it] is incorrect." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014). Because Broward Bulldog has failed to challenge the determination that the invited-error doctrine applies, Broward Bulldog has "abandoned any challenge of that ground, and it follows that the [ruling] is due to be affirmed." *Id.*

### D. The District Court Erred in Only Some of Its Rulings on the Applicable Exemptions.

We divide our discussion of the rulings on the applicable exemptions in five parts. First, we conclude that the district court applied the correct standard of review when it ruled on the redactions made under Exemptions 1 and 3. Second, we explain that the district court misunderstood Exemption 7(C) and erred when it refused to apply the exemption to redactions made in 17 documents. Third, we explain that the district court erred when it applied Exemption 7(D) to redactions made in documents 2 and 27. Fourth, we explain that, with two exceptions, the district court committed no error in applying Exemption 7(E) to documents 2 and 22. Fifth, we explain that the district court did not err in upholding redactions under Exemption 5 to documents 2, 5, and 22.

23

1.  Exemptions 1 and 3 (Executive-Order and Statutory Exemptions).

Exemptions 1 and 3 permit the government to withhold information that, if disclosed, would compromise national security. Exemption 1 permits the government to withhold information that is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and that is "properly classified pursuant to [that] Executive order." 5 U.S.C. § 552(b)(1). The relevant order, Executive Order 13526, provides that information may be classified if it "pertains" to "intelligence activities (including covert action), intelligence sources or methods, or cryptology." Exec. Order No. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009). Exemption 3 permits the government to withhold information "specifically exempted from disclosure by statute," if the statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). And the National Security Act of 1947 directs the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1); *see Cent. Intelligence Agency v. Sims*, 471 U.S. 159, 167–68 (1985).

The district court accorded "substantial weight" to the explanations provided by the government for the redactions made under the two exemptions, and it

24

determined that both exemptions apply to the material redacted from documents 3 and 5. It explained that, "[b]ecause of the possible strong implications for national security, courts should defer to an agency's decision to withhold information under Exemptions 1 and 3." So "[w]hile the burden of proof is on the [g]overnment, a reviewing court must recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse [e]ffects . . . might occur as a result of public disclosures of a particular classified record." It then concluded, "[a]fter conducting a detailed review of the redactions, in conjunction with the Hardy Declaration," that the Bureau "provided ample evidence [that] the redacted material is exempt from disclosure under Exemptions 1 and 3 because of national security concerns."

Broward Bulldog argues that the district court applied the wrong standard of review because it deferred to the Bureau. It contends that the Act requires *de novo* review, 5 U.S.C. § 552(a)(4)(B), which bars the district court from giving deference to the Bureau for Exemptions 1 and 3. We disagree.

The Supreme Court has explained that agency decisions to protect information governed by the National Security Act under Exemption 3 "are worthy of great deference given the magnitude of the national security interests and potential risks at stake." *Sims*, 471 U.S. at 179. And our sister circuits have respected that admonition. *See, e.g.*, *Am. Civil Liberties Union v. U.S. Dep't of*

25

*Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011) ("Because courts lack the expertise necessary to second-guess . . . agency opinions in the typical national security . . . case [under the Act], [they] must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." (citation and internal quotation marks omitted)); *Maynard*, 986 F.2d at 555 (holding for the First Circuit that "court[s] must accord substantial weight and due consideration to the [Central Intelligence Agency's] affidavits" under Exemption 3) (citation and internal quotation marks omitted). Under *Sims*, the district court owed substantial deference to the Bureau's invocation of Exemption 3 even though the Bureau still bore the burden of proving the applicability of that exemption.

Broward Bulldog's challenge to Exemption 1 deference fares no better. Our sister circuits have long understood Exemption 1 to require them to "accord substantial weight to an agency's affidavit concerning the details of the classified status of [a] disputed record." *Maynard*, 986 F.2d at 555 n.7; *accord Jones v. Fed. Bureau of Investigation*, 41 F.3d 238, 244 (6th Cir. 1994); *Krikorian v. Dep't of State*, 984 F.2d 461, 464 (D.C. Cir. 1993); *McDonnell v. United States*, 4 F.3d 1227, 1244 (3d Cir. 1993); *Wiener v. Fed. Bureau of Investigation*, 943 F.2d 972, 980 (9th Cir. 1991); *Stein v. Dep't of Justice*, 662 F.2d 1245, 1255 (7th Cir. 1981). Congress ratified this understanding in 1996 when it amended the Act to include the following language: "In addition to any other matters to which a court accords

26

substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B)." Electronic Freedom of Information Act Amendments, Pub. L. No. 104-231, § 6, 110 Stat. 3048, 3050 (1996) (codified as amended at 5 U.S.C. § 552(a)(4)(B)). This amendment, adopted against the longstanding circuit practice of according "substantial weight" to agency affidavits in the Exemption 1 context, not only ratifies the deference courts have given to agencies under Exemption 1, but also extends it to matters of "technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B)" of the Act. *Id.*; *cf. Castillo v. U.S. Attorney Gen.*, 756 F.3d 1268, 1273 (11th Cir. 2014) ("Where words are employed in a statute which had at the time a well-known meaning . . . in the law of this country, they are presumed to have been used in that sense unless context compels to the contrary." (quoting *Lorillard v. Pons*, 434 U.S. 575, 583 (1978) (alterations adopted)). Whatever tension might otherwise exist between the Act's requirement of *de novo* review and deferring to an agency's explanation for withholding information, Congress has approved of deference within the specific context of Exemption 1. Accordingly, the district court did not err by deferring to the Bureau's affidavit supporting the Exemption 1 claim.

Broward Bulldog also suggests in its reply brief that the district court erred when it *applied* the standard it chose because the "arguments [of the Bureau] do not show either logic or plausibility," but this argument is abandoned. Broward Bulldog discussed only the legal standard in its opening brief, not the application of that standard to the facts of this appeal. And "[o]ur longstanding case law rule is that an appellant who does not raise an issue in his opening brief may not do so in his reply brief." *United States v. Durham*, 795 F.3d 1329, 1330 (11th Cir. 2015) (en banc).

## 2. Exemption 7(C) (Personal Information)

Exemption 7(C) protects "records or information compiled for law enforcement purposes, but only to the extent that . . . production . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). "The term 'unwarranted' requires [courts] to balance the [relevant] privacy interest against the public interest in disclosure." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171 (2004). If the government establishes that certain information implicates a "personal privacy" interest, 5 U.S.C. § 552(b)(7)(C), the requestor "must show that the public interest sought to be advanced is a significant one" and that "the information is likely to advance that interest." *Favish*, 541 U.S. at 172. We first consider the privacy interests at issue

28

before discussing whether Broward Bulldog has met its burden to establish a significant public interest.

Exemption 7(C) encompasses a strong privacy interest in "the intimate details of an individual's life" and "information about an individual which he could reasonably assert an option to withhold from the public at large because of its possible adverse effects upon himself or his family." *Nadler v. U.S. Dep't of Justice*, 955 F.2d 1479, 1489 (11th Cir. 1992) (quoting *L & C Marine Transport, Ltd. v. United States*, 740 F.2d 919, 923 (11th Cir. 1984)), *abrogated on other grounds by U.S. Dep't of Justice v. Landano*, 508 U.S. 165 (1993). The "names and other identifying information" of individuals associated with an investigation—"even if they are not the subject[s] of the investigation"—implicate a "strong" privacy interest because "of the potential for harassment, intrusion, and stigmatization resulting from disclosure of an individual's connection with a criminal investigation." *Id.* at 1489 (citation and internal quotation marks omitted). In determining whether information is identifying, we consider the information "not only from the viewpoint of the public, but also from the vantage of those who would have been familiar" with a particular individual. *Reporters Comm.*, 489 U.S. at 768 (quoting *Rose*, 425 U.S. at 380–81). At least in cases involving a major terrorist attack and the ensuing investigation, "any information contained in 7(C) investigatory files [that] would reveal the identities of individuals who are subjects,

29

witnesses, or informants in law enforcement investigations [is] categorically exempt from disclosure" unless disclosure advances a substantial public interest. *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995).

The Bureau redacted, among other things, the names, addresses, and phone numbers of many agents, suspects, witnesses, and other individuals involved in the investigation. The Bureau also redacted information about the occupations, places of residence, or other personal information about these individuals that could be indirectly identifying. For example, the Bureau withheld the employment details about an individual who owned a gas station at which several hijackers were employed, and it redacted the dates that an individual traveled to Oman and Venice. Finally, the Bureau redacted other types of information that do not clearly identify any individual named in the documents, such as information stating that a particular interview occurred in Venice.

The district court ruled that the government failed to satisfy its burden for all but two of the redactions it made in 17 documents, and Broward Bulldog defends those rulings on appeal. The district court stated that the Bureau provided only "conclusory statements that disclosing the information could cause harassment," and it suggested that the Bureau needed to provide a specific assessment for each redaction "to explain why [a] particular individual's name deserves protection and how disclosure would constitute a clearly unwarranted invasion of the person's

30

privacy." In addressing the privacy interests of agents, suspects, and others, the district court maintained that "once . . . information is in the public domain, there is no longer a privacy interest justifying nondisclosure." And like Broward Bulldog, the district court stressed that the government had not explained why some names were redacted and others were not.

The district court also strongly suggested that a privacy interest should not be protected if an individual was connected to the 9/11 attacks or even was of investigative interest in connection with those attacks. Broward Bulldog adds that a privacy interest should not be protected if the relevant information is exculpatory. This reasoning is flawed.

At the outset, we disagree that an individual assessment is always necessary to support every redaction made under Exemption 7(C). We held in *Nadler* that the government need not "make a separate showing as to the applicability of Exemption 7(C) to each particular person identified in its records." 955 F.2d at 1488. We explained that "where the public and privacy interests that affect the balancing under Exemption 7(C) are the same for all the information withheld, the [g]overnment's proof applies equally to all the contested records," and "categorical balancing is appropriate." *Id.* at 1488–89.

The district court committed three errors that caused it to understate the privacy interests involved in most of the redactions. First, the district court

31

erroneously applied the public-domain doctrine to many of the disclosures. The district court, relying another district court's decision, ruled that "[o]ne can have no privacy interest in information that is already in the public domain." *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 840 F. Supp. 2d 226, 233 (D.D.C. 2012). We have not adopted the public-domain doctrine regarding Exemption 7(C), and we need not decide whether to do so now because, even assuming the validity of the doctrine, the district court misapplied it here.

Under the public-domain doctrine, "records which otherwise may be exempt from disclosure under the FOIA 'lose their protective cloak' if they have been 'disclosed and preserved in a permanent public record.'" *Sellers v. U.S. Dep't of Justice*, 684 F. Supp. 2d 149, 162 (D.D.C. 2010) (quoting *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999)). "The logic of the public domain doctrine is that 'where information requested is truly public, then enforcement of an exemption cannot fulfill its purposes.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 963 F. Supp. 2d 6, 12 (D.D.C. 2013) (quoting *Cottone*, 193 F.3d at 554). To invoke the doctrine, a requester must establish "that the information sought is truly public and that the requester [will] receive no more than what is publicly available." *Id.* (quoting *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001)); *see also Wolf v. Cent. Intelligence Agency*, 473 F.3d 370, 378 (D.C. Cir. 2007) ("Prior disclosure of similar information does not suffice; instead the

*specific* information sought by the plaintiff must already be in the public domain by official disclosure."). A failure to establish that the same information sought has been made public will cause an otherwise valid redaction to stand. *See, e.g.*, *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1279–80 (D.C. Cir. 1992) (rejecting application of public-domain doctrine where plaintiff submitted no evidence that any specific portion of tape recordings had been made public despite submitting "over 100 [newspaper] articles" suggesting that some unspecified portions of the tapes had been played at a public trial).

For purposes of the public-domain doctrine, only the individual discussed in the document or the agency in possession of the document may waive the individual's right to redaction by disclosing the individual's identity. *See Nation Magazine*, 71 F.3d at 896; *Marino v. Drug Enf't Admin.*, 685 F.3d 1076, 1082 (D.C. Cir. 2012) (explaining that the public-domain doctrine does not apply "when someone other than the agency from which the information is being sought discloses it" (citation and internal quotation marks omitted)). Information is not in the "public domain" if it is merely the subject of public speculation. *See Wolf*, 473 F.3d at 378; *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983) (rejecting suggestion that public speculation about Central Intelligence Agency liaison with Iranian government constituted prior disclosure).

Broward Bulldog does not suggest that it proved that the same information

33

*in each redaction* is also in the public record, or that the Bureau or the relevant individuals disclosed the information in each redaction. Indeed, the district court relied on information that "the [Bureau] *or media sources*" placed into the public domain, and the government maintains that it already released all the names that it had previously released into the public domain. Because the district court ruled that the public-domain doctrine applies to information that is in the public domain based only on media speculation and did not require Broward Bulldog to prove the *same* information in each redaction was already in the public domain, the district court erred.

Second, the district court erred when it ruled that Exemption 7(C) does not protect a privacy interest if an individual was connected to or was of investigative interest for the 9/11 attacks. Regardless of whether an individual is innocent or guilty, "where the subject of the documents is a private citizen, the privacy interest is at its apex." *Favish*, 541 U.S. at 166 (alteration adopted) (citation and internal quotation marks omitted). We do not "afford a lesser degree of privacy to those who violate the laws of the United States" because distinguishing the innocent from the guilty "violates the proposition that individuals have a substantial privacy interest in their criminal histories." *O'Kane v. U.S. Customs Serv.*, 169 F.3d 1308, 1310 (11th Cir. 1999) (internal quotation marks omitted).

We also disagree with Broward Bulldog that the innocent will necessarily welcome exculpatory disclosures. There is "special reason" to protect "information about persons interviewed as witnesses or initial suspects . . . whose link to the official inquiry may be the result of mere happenstance." *Favish*, 541 U.S. at 166. "[E]xemption 7(C) takes particular note of the 'strong interest' of individuals, whether they be suspects, witnesses, or investigators, 'in not being associated unwarrantedly with alleged criminal activity'" because "of the potential for harassment, intrusion, and stigmatization." *Nadler*, 955 F.2d at 1489 (quoting *Dunkelberger v. U.S. Dep't of Justice*, 906 F.2d 779, 781 (D.C. Cir. 1990)); *see also Am. Civil Liberties Union v. U.S. Dep't of Justice*, 750 F.3d 927, 934 (D.C. Cir. 2014) ("[N]ow that these defendants have been acquitted or had the relevant charges dismissed they have a significant and justified interest in avoiding additional and unnecessary publicity."). As Hardy explained in his declaration, "9/11 was the most heinous terrorist attack to ever happen on American soil," so "[a]ny association or presumed association with these attacks casts the[] [implicated] individuals in an extremely negative light." Just as releasing a criminal's rap sheet could remind the public of events it may have forgotten, *Reporters Comm.*, 489 U.S. at 769, disclosing the redacted information here could, as Hardy also explained, "cause . . . serious disruptions of the[] lives [of former suspects and others] by reigniting old suspicions, sustaining any existing negative

35

inferences into their character[s], and/or subjecting them to additional harassing inquiries and/or negative reporting in the press."

Third, the district court erred when it ruled that the government's "inconsistent" approach to the redaction of personal information undermined the application of Exemption 7(C). The relevant question is whether the redactions the government made were proper, not whether it could have made *additional* redactions. Neither the district court nor Broward Bulldog cites any authority to support the argument that the government must explain the inconsistent application of an exemption. That position is unsupported by the text of the Act and, if adopted, would have troubling consequences. In addressing an analogous argument, we explained that to conclude that an agency waives its right to withhold a document when it releases "related documents . . . would be contrary both to the case law on waiver and to the policies underlying [the Act] and its exemptions," because it would "tend to inhibit agencies from making any disclosures other than those explicitly required by law." *Fla. House of Representatives v. U.S. Dep't of Commerce*, 961 F.2d 941, 947 (11th Cir. 1992) (quoting *Mobil Oil Corp. v. Envt'l Prot. Agency*, 879 F.2d 698, 700, 701 (9th Cir. 1989)). And in any event, the Bureau has provided a reasonable explanation for its approach to redacting some names but not others. *See* Suppl. Authority 08/01/18, at 1–2 (noting that certain names were publicly disclosed by the Review

Commission itself and that others were disclosed consistent with the Bureau's policy of releasing the names of senior officials). In short, the district court erroneously understated the significant privacy interests that the personally identifying information at issue implicates.

Because the Bureau has established that a significant privacy interest exists in withholding the information, the requestor must identify a "significant" public interest and "show the information is likely to advance that interest." *Favish*, 541 U.S. at 172. The public's interest in "having the information for its own sake" falls outside the Act's scope. *Id*. Instead, "the only relevant public interest in the . . . balancing analysis [is] the extent to which disclosure of the information sought would she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 497 (1994) (citation and internal quotation marks omitted). A bare interest in learning who may have been involved in the 9/11 attacks "falls outside the ambit of the public interest that the [Act] was enacted to serve." *Id.* at 500 (citation and internal quotation marks omitted); *see also Davis*, 968 F.2d at 1282 (holding that although the public "undoubtedly [had] considerable interest" in learning details about an informant's "possible role in the Kennedy assassination," this interest fell outside the ambit of the Act because the information would "reveal little or nothing about an agency's own conduct"

37

(alteration adopted) (citation and internal quotation marks omitted)). "The private needs" of a requestor or others "for documents in connection with litigation . . . play no part in whether disclosure is warranted." *L&C Marine*, 740 F.2d at 923. To rebut the privacy interests implicated here, Broward Bulldog must establish how disclosure would shed light on the Bureau's performance of its statutory duties.

Broward Bulldog argues that disclosing personal identifying information would serve the public interest because the Bureau "invited public interest in the details of its Sarasota investigation when it very publicly undertook to refute the accuracy of the Bulldog's reports." But it cites no authority to support this assertion. We agree with the government that Broward Bulldog "cannot demonstrate a public interest in uncovering government malfeasance by pointing to the government's denials of [its] accusations." And we reiterate that there is a difference between public curiosity and the type of public interest that can outweigh a personal privacy interest under Exemption 7(C).

The district court likewise did not identify a substantial public interest. It ruled that "there is significant public interest in knowing who investigated the September 11 attacks and briefed the Meese Commission," in "learning about the . . . investigation of the [Saudi family]," and in obtaining "information about who may have been involved in the September 11 attacks," particularly in the light of a pending lawsuit in New York against Saudi Arabia. But other than citing an

38

inapposite decision from another circuit, *see Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1093 (D.C. Cir. 2014), the district court never explained how these interests are cognizable under the Act.

To be sure, the public has some interest in the information that is relevant to our analysis under Exemption 7(C). The names of those involved in an investigation into a major terrorist attack could reveal how the government took action with respect to certain leads. Disclosure might also permit Broward Bulldog and other media outlets to contact individuals involved in the investigation. But these public interests cannot outweigh the privacy interests that private citizens hold in not being associated with a major terrorism investigation, which we reiterate are at their "apex" here. *Favish*, 541 U.S. at 166 (citation and internal quotation marks omitted).

Because Broward Bulldog has failed to establish a significant public interest that can outweigh the strong privacy interests in the clearly identifying information at issue—such as names, addresses, and phone numbers, we reverse the order of the district court for these classes of information. But as discussed, the Bureau seeks to redact other types of information that do not clearly identify any individual—for example, information stating that a particular interview took place in Venice or that an individual lived in Sweden—that do not clearly identify any of the persons named in the documents. For all potentially identifying information

39

that is not a name, address, or phone number, we remand to the district court to allow it to determine in the first instance whether the information is identifying.

### 3.  Exemption 7(D) (Confidential Sources)

Exemption 7(D) protects "records or information compiled for law enforcement purposes, but only to the extent that . . . production . . . could reasonably be expected to disclose the identity of a confidential source" and, "in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). To establish that the exemption applies, the government must prove that "the source provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." *Landano*, 508 U.S. at 172 (citation and internal quotation marks omitted). For example, the "nature of [an] informant's ongoing relationship with the Bureau," "the character of the crime at issue," and "the source's relation to the crime" may support a reasonable inference of an assurance of confidentiality. *Id.* at 179. When the government establishes that a source provided information under an assurance of confidentiality, Exemption 7(D) creates a "per se limitation on disclosure" that "does not disappear if the

identity of the confidential source later becomes known through other means."
*L&C Marine*, 740 F.2d at 925.

The district court ruled that Exemption 7(D) protects information about a jailhouse informant named in document 2, but not the same information about the informant that appears in document 27, and that it protects the name of the former security officer of the gated community where the Saudi family lived. When addressing the redactions of the jailhouse informant's information in document 2, the district court ruled that "the source spoke with an implied assurance of confidentiality" because "the information [obtained from the informant] concerned violent criminal activities," including terrorism and unsolved homicides, "that could place the source in harm's way should the individual's identity become known." But it provided a different analysis of the notes from the informant's interview in document 27. It ordered the government to disclose the redacted information because Exemption 7(D) was "invoked simultaneously with Exemptions 6 and 7(C)" and the district court was "unable to determine what specific information the [g]overnment s[ought] to protect under Exemption 7(D)." As for the security guard, the district court explained that "[t]he redacted language does not state the [Bureau] interviewed this individual, and Hardy does not explain how the individual was a[] . . . source." But it ruled that because "Hardy states any redaction under [Exemption 7(D)] protects the names of parties who provided the

41

[Bureau] confidential information[,] . . . this redaction protects identifying information about a confidential source" and the exemption applies.

Both Broward Bulldog and the government challenge these rulings. Broward Bulldog argues that the exemption does not apply at all because the informant's and the security guard's identities, as well as the information they provided, are already public and the government has not established that either source received an assurance of confidentiality. According to Broward Bulldog, the district court correctly ordered the disclosure of the informant's information in document 27, but it incorrectly protected information about both sources in document 2. The government takes the opposite position: It contends that it is irrelevant that the information may be public, and it maintains that both sources received assurances of confidentiality. The government argues that the district court erred when it ordered the disclosure of the identifying information in document 27, but correctly applied the exemption to information about both sources in document 2.

We agree in part with the government and Broward Bulldog. Exemption 7(D) protects the information about the informant in documents 2 and 27, but it does not apply to information about the security guard.

As an initial matter, the public-domain doctrine does not apply to Exemption 7(D). We have held that because "[c]onfidential, as used in [E]xemption 7(D), . . . is meant to be construed as 'given in confidence,'" and not as "secret," Exemption

42

7(D) protects sources even if a "the plaintiff[] [knows] who the [sources] were" based on public sources. *L&C Marine*, 740 F.2d at 925 n.8 (quoting *Radowich v. U.S. Att'y*, 658 F.2d 957, 959 (4th Cir. 1981)); *accord Irons v. Fed. Bureau of Investigation*, 880 F.2d 1446, 1448 (1st Cir. 1989) (agreeing with *L & C Marine* that "law enforcement agencies need not disclose information about source identity even though the source's identity is already publicly known"). We have stressed that after the government proves that a source received an assurance of confidentiality, Exemption 7(D) creates a "per se limitation on disclosure." *L&C Marine*, 740 F.2d at 925. The district court erred by relying on another district court's ruling that a party requesting information can overcome Exemption 7(D) by showing "that the 'exact information' contained in the record is already in the public domain." *Bullock v. Fed. Bureau of Investigation*, 587 F. Supp. 2d 250, 253 (D.D.C. 2008).

Broward Bulldog argues that the Bureau failed to establish that the informant provided information under an assurance of confidentiality, but we disagree. As the district court understood when it applied the exemption to document 2, the informant spoke under an implied assurance of confidentiality because he provided information about terrorism and unsolved homicides. As Hardy explained in his declaration, disclosure of "specific, singular, detailed information" related to the "investigation of terrorism activities" by the Bureau

43

"could subject [the informant], as well as [his] famil[y], to embarrassment, humiliation, and/or physical or mental harm." And as he stated, "in the . . . experience [of the Bureau], sources providing information to the [Bureau] about extremist activities do so at great peril to themselves and have faced retaliation and threats (including death threats) when their assistance to the [Bureau] has been publicly disclosed." *See also Ctr. for Nat. Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 929 (D.C. Cir. 2003) ("A terrorist organization may even seek to hunt down detainees (or their families) who are not members of the organization, but who the terrorists know may have valuable information about the organization.").

The Supreme Court and our sister circuits have held that similar circumstances establish an implied assurance of confidentiality. The Supreme Court explained in *Landano* that "[m]ost people would think that witnesses to a gang-related murder likely would be unwilling to speak to the Bureau except on the condition of confidentiality." 508 U.S. at 179. And the District of Columbia Circuit has held that "conspiracy to distribute crack and powder cocaine" and "the crimes of rebellion or insurrection, seditious conspiracy, and advocating overthrow of the government [are] serious offenses that, when undertaken by a criminal enterprise with a record of violence, warrant the inference that an informant expects confidentiality." *Mays v. Drug Enf't Admin.*, 234 F.3d 1324, 1329 (D.C. Cir. 2000) (citation and internal quotation marks omitted); *see also Hodge v. Fed.*

44

*Bureau of Investigation*, 703 F.3d 575, 581–82 (D.C. Cir. 2013) ("Given the vicious nature of the crimes and the explanation offered in the . . . affidavits, we conclude that the witnesses who provided the relevant information about Hodge's involvement in the murders would have expected that their identities remain confidential.").

Broward Bulldog suggests that the Bureau had to "explain the sources' relation to the crime, whether the source received payment, and whether the source ha[d] an ongoing relationship with the law enforcement agency," but we disagree. Broward Bulldog cites a decision that explained that, to determine whether there was an implied assurance of confidentiality, courts "examine[]" "several considerations . . . , including the nature of the crime and the informant's relation to the crime." *Elec. Privacy Info. Ctr. v. U.S. Drug Enf't Agency*, 192 F. Supp. 3d 92, 111 (D.D.C. 2016). That court ruled that the Drug Enforcement Agency failed to provide a "detailed explanation of the [relevant] factors." *Id.* But it did not suggest that a source is confidential *only* when every potentially relevant factor favors confidentiality. Such a rule would contravene *Landano*, in which the Supreme Court explained that a variety of "narrowly defined circumstances . . . will support [an] inference" of confidentiality. 508 U.S. at 179 ("There may well be other generic circumstances in which an implied assurance of confidentiality fairly can be inferred."); *see also Mays*, 234 F.3d at 1330 (discussing *Landano*).

Although the district court did not err when it applied Exemption 7(D) to the informant's information in document 2, it erred when it ordered the disclosure of the information in document 27. As evidenced by its analysis of document 2, the district court agreed with the government that the informant provided information to the Bureau under an implied assurance of confidentiality. It refused to grant summary judgment to the government for the redactions in document 27 only because it was "unable to determine what specific information the [g]overnment s[ought] to protect under Exemption 7(D)," as opposed to Exemptions 6 and 7(C). But the government submitted a detailed chart linking blocks of redacted text to specific exemptions. And of course, the government may invoke multiple exemptions to protect the same information. It should not be surprising that information about an informant implicates Exemption 7(D), which protects information from confidential informants, *and* Exemptions 6 and 7(C), which protect personal information generally—whether it relates to a confidential informant or any other individual.

As to the security guard, we agree with Broward Bulldog that his name should not have been withheld under Exemption 7(D) because his actions— including his speaking on the record to a journalist before he spoke to the Bureau—would not support an inference that he spoke to the Bureau under an implied assurance of confidentiality. Even so, because the Bureau asserted that the

46

identifying information of persons like the security guard who were involved in the investigation is also covered by Exemption 7(C), and his name and other information is clearly identifying, we affirm the redaction under Exemption 7(C).

4. Exemption 7(E) (Law Enforcement Techniques and Procedures)

Exemption 7(E) protects "records or information compiled for law enforcement purposes, but only to the extent that . . . production . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

Under Exemption 7(E), "[t]he phrase 'techniques and procedures' . . . refers to how law enforcement officials go about investigating a crime." *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010). The purpose of this exemption is to shield sensitive law enforcement techniques from disclosure to prevent criminals from "circumventing future [law enforcement] investigations." *Blackwell v. Fed. Bureau of Investigation*, 680 F. Supp. 2d 79, 92 (D.D.C. 2010), *aff'd*, 646 F.3d 37 (D.C. Cir. 2011).

Our sister circuits have held, and we agree, that law enforcement techniques or procedures that are universally known to the public cannot be shielded from

disclosure under the Act. *See Rugiero v. U.S. Dep't of Justice*, 257 F.3d 534, 551 (6th Cir. 2001); *Davin v. U.S. Dep't of Justice*, 60 F.3d 1043, 1064 (3d Cir. 1995); *Rosenfeld v. U.S. Dep't of Justice,* 57 F.3d 803, 815 (9th Cir. 1995). But even for well-known techniques or procedures, Exemption 7(E) protects information that would reveal facts about such techniques or their usefulness that are not generally known to the public, as well as other information when disclosure could reduce the effectiveness of such techniques. *See, e.g.*, *Vazquez v. U.S. Dep't of Justice*, 887 F. Supp. 2d 114, 116–17 (D.D.C. 2012) (observing that while the public is generally aware of the Bureau's National Crime Information Center databases, details of their use and whether individuals are mentioned in them is not known to the public). For example, when disclosure would expose specific vulnerabilities in law-enforcement investigative techniques and procedures, Exemption 7(E) applies. *See, e.g.*, *Blackwell v. Fed. Bureau of Investigation*, 646 F.3d 37, 42 (D.C. Cir. 2011) (holding that Exemption 7(E) applied when disclosure would "expos[e] [the Bureau's] computer forensic vulnerabilities to potential criminals"). Exemption 7(E) also covers disclosures that would reveal an agency's investigatory "targeting priorit[ies]." *Am. Civil Liberties Union of Mich. v. Fed. Bureau of Investigation*, 734 F.3d 460, 466 (6th Cir. 2013). As the Sixth Circuit has explained, "[o]ur intelligence and law-enforcement agencies are awash in a sea of data, much of it public, so a choice to focus on a particular slice of that data directly reveals a

48

targeting priority, and indirectly reveals the methodologies and data used to make that selection." *Id.* ("There is no way to release certain types of public information without showing the FBI selection process.").

The parties dispute whether information redacted from documents 2 and 22 falls within Exemption 7(E). The Bureau redacted information from document 2, a briefing report on the Bureau's investigation of the Saudi family, on the ground that it relates mainly to "sensitive investigative techniques and procedures" and the "dates and types of investigations (preliminary or full investigations)." And the Bureau redacted information in document 22, a slideshow of an overview of the 9/11 investigation, on the ground that it relates to the "collection and/or analysis of information." The district court upheld all of the redactions.

The parties agree that the dispute turns on whether the redacted information, if released, would "disclose techniques and procedures for law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(7)(E). Broward Bulldog does not dispute that the information was "compiled for law enforcement purposes," and the government does not argue that the redacted information, if released, would "disclose guidelines for law enforcement investigations or prosecutions." *Id.*

Broward Bulldog argues that the Bureau cannot redact information under the Act if the information is already in the public domain, and it maintains that the Bureau "has not proven that the information it withheld or redacted from

49

[d]ocument 22 is not disclosed in . . . some other public document." It also argues that revealing the information in both documents 2 and 22 would not reveal the "techniques and procedures for law enforcement investigations or prosecutions," *id.*, because the documents reveal only "[f]acts and information the [Bureau] gathered about the hijackers and their activities." And it argues that the final qualifying phrase, "if such disclosure could reasonably be expected to risk circumvention of the law," modifies both the "guidelines" clause and the "techniques and procedures" clause in the statute. So the government must prove— and, Broward Bulldog argues, has not proven—that revealing the redacted information "could reasonably be expected to risk circumvention of the law." *Id.*

In document 2, the Bureau withheld the phrase "telephone, email or financial contact" from a passage discussing the lack of evidence of contact between the hijackers and the Saudi family. The Bureau asserted that disclosing this passage would "reveal techniques used by the [Bureau] in terrorism investigations, specifically the agency's reliance upon, and its ability to obtain, evidence from these sources." But the fact that the Bureau might look to phone, email, or financial records in an investigation is so obvious and widely known that the withheld information fails to "disclose" any law-enforcement technique.

As to document 22, we agree with the government that most of its redacted information reveals the usefulness of certain law-enforcement techniques and

procedures or reveals vulnerabilities that are not generally known to the public. For example, slide 19 details the specific methods the hijackers used to manage their finances to avoid detection by law enforcement. Slide 20 similarly explains how and when the hijackers obtained passports, visas, and identification cards that they used to enter and travel throughout the country. Other slides detail how the attacks were funded, the travel arrangements the hijackers used to enter the country, and the various tactics the hijackers used to prepare for the attacks. These redacted passages "reveal the data considered relevant by the [Bureau], the specific factors considered in the investigation, and the commonalities and patterns detected (and not detected) by the [Bureau] when analyzing the data." Some of the materials also "disclose the [Bureau's] 'playbook' for apprehending criminals" and "allow[] criminals to place themselves a step ahead of law enforcement." Because almost all of these passages expose aspects of the Bureau's investigative and analytical methodologies, they disclose "how law enforcement officials go about investigating a crime" and are protected under Exemption 7(E). *Allard*, 626 F.3d at 682.

Although the bulk of the redacted slides in document 22 are protected under Exemption 7(E), the government has failed to meet its burden with respect to three slides. First, in slide 13 the government withheld a grainy photograph taken by a security camera in an unknown location, and it is unclear who or what the photo

depicts. The Bureau states that disclosing this image would permit future subjects to "know where to find the security camera so as to avoid the area in which the camera points, thereby circumventing detection or the ability for the [Bureau] and law enforcement to try to obtain an image of the subject." Although we agree that disclosing the location of a specific, hidden camera still in operation would disclose a "technique or procedure of law enforcement," the Bureau has not provided enough facts to determine that this photo is from a hidden camera as opposed to one that is visible or that the photo is clear enough to reveal the camera's location to any subject. So we reverse the summary judgment protecting the photo from disclosure and remand to the district court to allow the Bureau to supplement the record with additional details about the camera.

The government also withheld slides 56 and 57 from document 22. These slides generally describe the facts about the investigation of Walid bin Attash, including that Osama bin Laden instructed Attash to assist with a hand-to-hand combat course intended to help select candidates for the 9/11 operation; that Attash learned more information about the 9/11 operation in a meeting with Khalid Sheikh Mohammed in Karachi; that he met with two other conspirators in Kuala Lumpur and Bangkok to case potential targets; and that Attash's "casing report" from his travels to Kuala Lumpur and Bangkok was recovered in Afghanistan. The Bureau argues that disclosure of these slides would risk revealing the "collection

52

techniques used to obtain such information" and also reveal "sensitivities that future subjects could exploit in the future while planning and performing an attack." But the government fails to explain how disclosing this information would risk revealing the specific collection methods by which it was obtained or otherwise reveal a law-enforcement vulnerability, and it is not self-evident to us how disclosure would create such risks. Because these slides do not disclose a law-enforcement technique or procedure, they are not protected under Exemption 7(E), and we reverse the ruling protecting them from disclosure.

In addition to disputing whether the redacted passages disclose law-enforcement techniques and procedures, Broward Bulldog argues that the Bureau must prove that each of its redactions and withholdings, if disclosed, "could reasonably be expected to risk circumvention of the law," 5 U.S.C. § 552(b)(7)(E), but we disagree. As an initial matter, it is not clear that this provision applies here. That statutory phrase follows the second of the two "would disclose" clauses: records are exempt if they "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." *Id.* The District of Columbia and Third Circuits have ruled that an agency must show a risk of circumvention of the law if the documents refer *either* to "guidelines for law enforcement investigations or

prosecutions" *or* to "techniques and procedures for law enforcement investigations or prosecutions." *See Pub. Employees for Env't'l Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 204 n.4 (D.C. Cir. 2014); *Davin*, 60 F.3d at 1064. By contrast, the Second and Ninth Circuits have held that the contravention clause modifies only the "guidelines" clause. *See Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 778 (9th Cir. 2015); *Allard*, 626 F.3d at 681. In those circuits, the government need not show that a disclosure will risk contravention of the law to protect information that would disclose law-enforcement techniques and procedures.

We need not take a side here. Even if this provision applies, the Bureau has met that burden. Disclosing unknown law enforcement techniques and procedures frequently "could reasonably be expected to risk circumvention of the law," 5 U.S.C. § 552(b)(7)(E), and that is the case here. Broward Bulldog reiterates that "[d]etailed information concerning the planning and execution of the 9/11 attacks is widely available already." But it misses the point that the redacted information in document 22 will *also* shed light on how Bureau agents uncovered that "detailed information." And as Hardy explained in his declaration, revealing "a playbook to future subjects" on, for example, "how much money one can move around, what form is more or less detectable, through what means, and where to avoid so as not to attract attention" may make it easier for others to circumvent the law. And

54

disclosing "how the hijackers were able to obtain identification, enter the country, and what types of identification they were successful at obtaining" as well as "the sources the [Bureau] obtains this information from, [and] the specific types of data the [Bureau] finds most useful" would threaten the Bureau's "ability to apprehend others using the same methods."

### 5.  Exemption 5 (Deliberative Process)

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption "includes a 'deliberative process privilege'" that is designed both to minimize public confusion about agency rationales and actions and "to allow agencies to freely explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny." *Moye, O'Brien, O'Rourke, Hogan, & Pickert v. Nat'l R.R. Passenger Corp.*, 376 F.3d 1270, 1277 (11th Cir. 2004) (quoting *Nadler*, 955 F.2d at 1490 and *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001)).

Broward Bulldog argues that the district court erred when it ruled that Exemption 5 applied to redactions in documents 2, 5, and 22. As for documents 2 and 5, we have already concluded that Broward Bulldog's challenge to the alleged "boilerplate" justifications for the application of Exemption 5 to these documents has no merit. Broward Bulldog's remaining challenge about document 2 is waived.

55

In its reply brief, Broward Bulldog argues that Exemption 5 does not apply to redactions in document 2 because that document was created for a "Congressionally-created [sic] Commission that was not, itself, an agency." We do not consider this issue because it was not raised in Broward Bulldog's opening brief. *See Durham*, 795 F.3d at 1330.

Document 22 is a different matter. We need not reach the question whether Exemption 5 protects information in document 22 that we have already held is covered under Exemption 7(C) and 7(E). But neither exemption applies to slides 56 and 57 of the document, so we must consider whether Exemption 5 applies to this information.

As its name suggests, the deliberative process privilege protects only "deliberative" materials—that is, materials that are "a direct part of the deliberative process in that [they make] recommendations or express[] opinions on legal or policy matters." *Miccosukee Tribe*, 516 F.3d at 1263 (quoting *Vaughn*, 523 F.2d at 1144). Material must also be "predecisional" to fall under the privilege. To be predecisional, information must be "prepared in order to assist an agency decision-maker in arriving at his decision." *Nat'l R.R. Passenger Corp.*, 376 F.3d at 1277.

The information contained in slides 56 and 57 fails to satisfy either requirement. As discussed, these slides contain general information about Walid bin Attash's activities around the time of the 9/11 attacks. The government has not

56

established that the information contained in the slides "makes recommendations or expresses opinions on legal or policy matters." *Miccosukee Tribe*, 516 F.3d at 1263 (quoting *Vaughn*, 523 F.2d at 1144). The slides contain only a list of factual statements, and "factual materials do not become privileged merely because they represent a summary of a larger body of information." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1232 (10th Cir. 2007); *see also Nat'l R.R. Passenger Corp.*, 376 F.3d at 1278 ("[T]he Supreme Court has held that factual information generally must be disclosed."). Similarly, nothing in the record suggests that that the slides were "prepared in order to assist an agency decision-maker in arriving at his decision." *Id.* at 1277. Although the materials might "predate[] a decision chronologically," we do not see how they "contribute[d] to [any] decision." *Id.* at 1278. Put differently, the information is "merely peripheral to actual policy formation." *Id.* at 1277–78. To be predecisional, "the record must bear on the formulation or exercise of policy-oriented judgment." *Id.* at 1278. Because these slides are not deliberative or predecisional, they do not fall under Exemption 5.

### E. The District Court Did Not Err when It Failed to Make Express Findings of Segregability.

Broward Bulldog argues that we must reverse because the district court made no express findings on segregability, but we disagree. In *Miccosukee Tribe*, we acknowledged that the District of Columbia Circuit requires express findings "as to whether any segregable portions of the withheld documents should have

57

been disclosed." 516 F.3d at 1265. But we explained that, "[i]n this Circuit, exacting requirements have not been placed on the district court's articulation of its reasons for sustaining a claim of exemption." *Id.* And we stated that the appeal "d[id] not present us with the appropriate occasion to consider whether to require additional levels of analysis and more detailed findings" because the district court conducted an "*in camera* review" and its review "was correctly conducted." *Id.*

The same reasoning applies here. The district court may not have used the word "segregability," but its lengthy analysis over the course of three orders establishes that it sought to limit the redactions to the extent possible. And there is no need to reverse and remand when both this panel and the district court have conducted *in camera* reviews to ensure that only exempt information is redacted. We will not require such a pointless formality. *See Juarez v. Dep't of Justice*, 518 F.3d 54, 60 (D.C. Cir. 2008) (explaining that the appellate court "need not prolong the case further by remanding it solely for th[e] purpose" of making a segregability finding because it "ha[d] the same record before [it] as did the district court" and it was "just as capable of evaluating the . . . affidavits regarding segregability as [wa]s the court below").

## F. The District Court Did Not Err when It Refused to Consider Documents at Issue in an Earlier-Filed Lawsuit.

Broward Bulldog argues that the district court erred when it declined to order the production of records that the newspaper had already sought in *Broward*

58

*Bulldog I* because the Act recognizes only nine exemptions and "[d]uplicative requests and productions are not among them." But "[t]he first-filed rule provides that when parties have instituted competing or parallel litigation in separate courts, the court initially seized of the controversy should hear the case." *Collegiate Licensing Co. v. Am. Cas. Co. of Reading, Pa.*, 713 F.3d 71, 78 (11th Cir. 2013). Indeed, "where two actions involving overlapping issues and parties are pending in two federal courts, there is a strong presumption across the federal circuits that favors the forum of the first-filed suit under the first-filed rule." *Id.* (alteration adopted) (citation and internal quotation marks omitted). That rule finds support in "considerations of comity and orderly administration of justice": "two courts of equal authority should not hear the same case simultaneously" and potentially "generate dueling appeals." *UtahAmerican Energy, Inc. v. Dep't of Labor*, 685 F.3d 1118, 1124 (D.C. Cir. 2012) (alteration adopted). Nor should the judiciary "expend judicial resources" to "allow[] the same . . . plaintiff multiple bites at the apple." *Id.* Broward Bulldog was already engaged in ongoing litigation before another district judge, so the district court here did not err when it refused to entertain "the exact same legal issues" raised by the "exact same parties" about the "exact same [documents]." *Collegiate Licensing*, 713 F.3d at 78.

Although Broward Bulldog concedes that "principles of comity and judicial efficiency" may apply in other circumstances, it argues that the government "cites

59

no authority for the proposition that these principles trump the . . . compliance requirements" of the Act. But it provides no authority to suggest that these generally applicable principles do *not* apply to litigation under the Act. It makes no sense to carve out a special exception for the Act. The same comity and efficiency considerations that ordinarily support the first-filed rule apply with equal, if not greater, force in this setting. As the district court explained, deciding which exemptions apply to the same documents in two separate proceedings risks "inconsistent findings . . . with respect to the [same] records." And the District of Columbia Circuit has explained that the problem of duplicate litigation is "particularly acute in . . . cases [under the Act]" because "multiple components of the same agency may withhold the same documents on the same grounds, thus potentially generating multiple lawsuits and appeals raising the same issues." *UtahAmerican*, 685 F.3d at 1125.

In any event, the district court in *Broward Bulldog I* recently issued an opinion on the records that Broward sought in its 2011 request. *See Broward Bulldog I*, No. 12-cv-61735-WJZ (S.D. Fla. Aug. 22, 2019). After the court enters a separate final judgment, Broward Bulldog will be free to appeal its decision.

Broward Bulldog suggests, unpersuasively, that we should require duplicate litigation notwithstanding the resolution of *Broward Bulldog I* because that case does not "disclose which records the Meese Commission reviewed." In other

60

words, it argues that it is entitled to duplicate litigation because it worded its two requests differently. Its first request sought all documents related to the Saudi family, and the second request sought documents reviewed by the Commission. So according to Broward Bulldog, only disclosures made in response to the second request will allow Broward Bulldog to "evaluate whether the [Bureau] provided the Meese Commission with the documents necessary to perform its task." But the Act provides a right to documents, not a right to information about how particular documents were used. *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 152 ("The Act . . . only obligates [an agency] to provide access to [information] which it in fact has created and retained."). We see no reason to allow Broward Bulldog to pursue duplicative litigation because it used different wording to request the same documents in two separate actions.

## IV. CONCLUSION

We **AFFIRM IN PART** and **REVERSE IN PART** the summary judgment, and we **REMAND** for further proceedings consistent with this opinion.

MARTIN, Circuit Judge, concurring in part and dissenting in part:

I agree with most all of the Majority Opinion.[1]  Yet this case requires our panel to rule on the propriety of a whole host of redactions made by the government to the many documents requested by the Broward Bulldog ("Bulldog") pursuant to FOIA, 5 U.S.C. § 552.  The redactions made by the government, in turn, rely on various exemptions to FOIA's production requirements.  I do not line up with the Majority Opinion on every one of its rulings regarding the government's redactions.  In particular, I dissent to the approval given by the Majority Opinion to the FBI's claimed redactions under Exemptions 7(C) and 7(E).  I do not believe those redactions comply with the requirements of FOIA.

I will not restate the facts and procedural history of this case, which are ably recited in the Majority Opinion.  Instead, I start with an overview of the law underlying my points of disagreement.  Under FOIA, a federal agency must disclose official information upon request, unless the request falls within one of nine enumerated exemptions.  See 5 U.S.C. § 552(a).  "These exemptions are

---

[1] Specifically, I concur in Parts III.A, B, C, E, and F of the Majority Opinion, which hold that the Federal Bureau of Investigation ("FBI") conducted an adequate search; the District Court had an adequate factual basis to issue a decision in this case; the District Court properly denied the Broward Bulldog's request to depose the FBI agent who briefed the 9/11 Commission on the investigation at issue in this case; and the District Court did not err by failing to make express findings on segregability or by declining to order the production of records the Bulldog had previously sought.  Also, with regard to government's redaction of documents it produced pursuant to the Freedom of Information Act ("FOIA") request from the Bulldog I agree with the discussion in the Majority Opinion in Parts III.D.1, 3, and 5.  I respectfully dissent from Parts III.D.2 and 4.

62

explicitly made exclusive, and must be narrowly construed." Milner v. Dep't of Navy, 562 U.S. 562, 565, 131 S. Ct. 1259, 1262 (2011) (citations and quotation marks omitted); see Ely v. FBI, 781 F.2d 1487, 1489–90 (11th Cir. 1986). Exemption 7 permits a federal agency to withhold "records or information compiled for law enforcement purposes," subject to certain conditions. 5 U.S.C. § 552(b)(7).

## I.    EXEMPTION 7(C)

I first turn to Exemption 7(C), which authorizes an agency to withhold records or information compiled for law enforcement purposes to the extent that revealing the information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[2] The inclusion of the term "unwarranted" calls on courts to balance "the public interest in disclosure against the interest Congress intended the Exemption to protect." U.S. Dep't of Justice v. Reporters Comm., 489 U.S. 749, 776, 109 S. Ct. 1468, 1483 (1989).

---

[2] Exemption 7(C) overlaps with Exemption 6, which permits withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6). Exemption 7(C) is "more protective of privacy" than Exemption 6. U.S. Dep't of Def. v. Fed. Labor Relations Auth., 510 U.S. 487, 496 n.6, 114 S. Ct. 1006, 1013 n.6 (1994); see Office of the Capital Collateral Counsel, N. Region of Fla. ex rel. Mordenti v. Dep't of Justice, 331 F.3d 799, 803 n.6 (11th Cir. 2003). So while the redactions under Exemption 7(C) also fall under Exemption 6, the FBI's argument focuses on Exemption 7(C), and I do as well.

In its production to the Bulldog, the FBI cited Exemption 7(C) as its basis for withholding the personal information of certain people named in the FBI's reports. This included persons of interest in the investigation that was the subject of the Bulldog's request, as well as the identity of FBI agents and other government employees involved in that investigation. On December 30, 2016, the government moved for partial summary judgment as to these redactions. On February 27, 2017, the District Court denied in relevant part the FBI's motion for summary judgment, holding that the FBI had not shown it was entitled to the challenged Exemption 7(C) redactions. Following the District Court's February order, the FBI made additional disclosures but again moved for summary judgment as to the remaining redacted information. On May 16, 2017, in a document-by-document, page-by-page analysis, the District Court again largely denied the government's motion for withholding under Exemption 7(C). The lone grant of an Exemption 7(C) redaction went to part of Document 22—a 60-page PowerPoint presentation dated April 25, 2014, and entitled "Overview of 9/11 Investigation." For this document, the District Court sustained the redaction of the names of two people not associated with the investigation whose names were incidentally mentioned.

The FBI appeals from the District Court's denial of withholding of personal information under Exemption 7(C), arguing that withholding under this exemption

is necessary to protect the privacy interest of people whose information appears in the documents. I find the FBI's arguments to be deficient in a number of respects and would affirm the District Court's orders as to the redactions under Exemption 7(C).

A. PROBLEM ONE: LACK OF SPECIFICITY

As a threshold matter, the FBI's Exemption 7(C) arguments fall short because the FBI fails to specify which documents or individual redactions it believes were wrongly ordered to be revealed. Instead, I understand the FBI to make a blanket argument that all the District Court's unfavorable rulings on Exemption 7(C) should be reversed. The FBI makes this broad and general argument despite acknowledging—and premising its argument on—the fact that courts reviewing redactions under Exemption 7(C) must "carefully examine the nexus between the requested information and the asserted public interest." Nevertheless, on the face of its appeal, the FBI fails to make clear what "information" should be analyzed. For example, the FBI mentions the responsibility of courts to "balance" in the context of "dates of birth, driver's license numbers, addresses, phone numbers, and other such information." Yet it fails to identify any driver's license numbers or phone numbers that might be disclosed. Thus, the relevance of this argument is not clear. In the same way, FBI's argument does not make clear whether it seeks to challenge all documents

65

analyzed by the District Court, or only those that are the subject of the Bulldog's appeal. By failing to point to the specific materials it says deserve withholding under Exemption 7(C), the FBI deprives this Court of any ability to perform the required analysis. See, e.g., United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) (refusing to search through the record for possible claims because "[j]udges are not like pigs, hunting for truffles").

The Majority Opinion raises no problem with the FBI's general approach in asserting its Exemption 7(C) claims in this appeal. To the contrary, when it condones the FBI's lack of specificity, it fails to properly frame the issue. According to the Majority Opinion, the FBI's approach is acceptable because "the government need not 'make a separate showing as to the applicability of Exemption 7(C) to each particular person identified in its records.'" Maj. Op. at 34 (quoting Nadler v. U.S. Dep't of Justice, 955 F.2d 1479, 1488 (11th Cir. 1992), abrogated on other grounds by U.S. Dep't of Justice v. Landano, 508 U.S. 165, 113 S. Ct. 2014 (1993)). However, before we ever reach the question of whether the FBI has done a proper categorical balancing of the private and public interests at stake in these redactions, we must ask whether the FBI has given proper notice of what rulings it is challenging. See United States v. Adkinson, 135 F.3d 1363, 1379 (11th Cir. 1998) (rejecting appellate brief for failure to point to specific errors in the record); see also 11th Cir. R. 28-1(i) (requiring citation to the record). Because

I believe it improper for the FBI to make a blanket challenge to all rulings on a given Exemption, without specifying which rulings it seeks to challenge, I would affirm the District Court's ruling as to all Exemption 7(C) redactions.

B. PROBLEM TWO: LACK OF CATEGORICAL DEFINITION

Even if the FBI's blanket approach to appealing from the District Court's orders were acceptable, I would not hold, as the Majority Opinion does, that the FBI has identified allowable categories of individuals for which Exemption 7(C) redactions are proper.  As I understand its argument, the FBI wants this court to endorse a categorical rule that "[p]eople involved in an investigation"—defined to include "witnesses, suspects, persons of interest, or government agents"—always have a protected privacy interest in their connection to the investigation.  The lone case the FBI cites for this proposition, National Archives & Records Administration v. Favish, 541 U.S. 157, 124 S. Ct. 1570 (2004), says nothing of the sort.  In Favish, the Supreme Court held that the family member of a deceased person has a privacy interest within the scope of Exemption 7(C).  Id. at 165, 124 S. Ct. at 1576.  The Favish Court further noted that people "whose link to the official inquiry may be the rest of mere happenstance" often have a right to official protection of their "intimate personal data," particularly where "the subject of the documents is a private citizen."  Id. at 166, 124 S. Ct. at 1577 (quotation marks omitted).  Favish indicates that, before categorical balancing is appropriate, some

caution must be taken to ensure that a proper "category" of persons has been established. The FBI exercised no such caution.

It is easy to see why the FBI's approach here is deficient. Take, for example, Document 2. In this document, the FBI redacted the name of a neighbor of the al-Hijjis. This neighbor was quoted by name in a September 8, 2011 Bulldog article and submitted an affidavit in support of the Bulldog's lawsuit. I do not accept the idea that this neighbor—who has thrust himself into the public discourse of the subject of this case on several occasions—should get the same personal-privacy considerations as both an FBI agent and a person of interest in the investigation. For that matter, I find it hard to understand why the privacy interests of an FBI agent and a person of interest to the investigation should be presumed to be so similar that we analyze them together. There may well be reasons to conduct the analysis in this way, but the FBI has not enlightened us as to what those reasons might be. It is not the job of this court to do government's work for it, by providing those reasons for ourselves.

The FBI's failure to identify a cognizable group of persons for whom categorical treatment makes sense gives us another basis for affirming the District Court's rulings as to Exemption 7(C).

## C. PROBLEM THREE: THE DISTRICT COURT PROPERLY BALANCED THE PUBLIC AND PRIVATE INTERESTS

Even if we had received information sufficient for us to reach the merits of the Exemption 7(C) redactions, I would reject the FBI's argument that the District Court failed to properly appreciate the privacy interest at stake and mistakenly measured the magnitude of the public's interest.[3]

### a. Privacy Interest

As to the privacy interest at stake in these documents, the FBI correctly points out that people have an interest in "not being associated unwarrantedly with alleged criminal activity." Nadler v. U.S. Dep't of Justice, 955 F.2d 1479, 1489 (11th Cir. 1992) (quotation marks omitted), abrogated on other grounds by U.S. Dep't of Justice v. Landano, 508 U.S. 165, 113 S. Ct. 2014 (1993). But the District Court appropriately considered this interest. In the first instance, the District Court analyzed the privacy interest for every piece of information for which the FBI sought to apply Exemption 7(C). In doing so, the District Court explained in each instance exactly how the government failed to meet its burden of redaction. Once the FBI produced another Vaughn index to explain its rationale for the redactions, the District Court again gave additional analysis of each claim, explaining why each of the government's rationales was insufficient. I do not

---

[3] I emphasize again that reaching the merits of this question is a non-starter because the FBI has not specified the personal information for which it believes disclosure was improperly ordered.

agree with the Majority Opinion's construction of the District Court's February order as holding that "Exemption 7(C) does not protect a privacy interest if an individual was connected to or was of investigative interest for the 9/11 attacks." Maj. Op. at 37. Rather, I understand the District Court to say that the rationale for privacy is lessened—though not eliminated—where a person's connection to the investigation at issue is already known. Even now, the FBI has continued to fail to produce information to bolster its claims of a privacy interest. Thus, I see no basis for overturning the District Court's rejection of these claims.

The FBI also argues the mere fact that a person's name has previously been disclosed does not waive that person's privacy interest, because the interest belongs to the person, not the FBI. True, a privacy interest is personal, but courts may consider the existing public record when measuring the magnitude of that privacy interest. See Reporters Comm., 489 U.S. at 763–64, 109 S. Ct. at 1476–77 (contrasting the privacy interest in "hard-to-obtain information" with information readily available to the public).

The Majority Opinion says the existence of the sought information in the public domain is irrelevant because the Bulldog has not established that "the same information in each redaction is also in the public record, or that the [FBI] or the relevant individuals disclosed the information in each redaction." Maj. Op. at 36 (emphasis omitted). Notably, the FBI does not make this argument. Indeed, the

70

FBI could not rely on this argument that is the premise of the Majority Opinion because the government has not actually identified the pieces of information for which it believes disclosure is erroneous. Rather, the government's argument is that the District Court erred by ordering production of information relevant to "some individuals whose identities have not been the subject of public speculation," and that even if an individual has been the subject of public speculation regarding this investigation disclosure can still impose an unfair stigma. Again, the FBI argues generally that the balance of interests "tilts even more strongly against disclosure when it comes to dates of birth, driver's license numbers, addresses, phone numbers, and other such information," but it does not point to any driver's license numbers, phone numbers, or home addresses that have been ordered to be disclosed. Similarly, the FBI makes the general argument that "[i]ndividuals acquitted of crimes have a clear privacy interest in controlling information in their publicly available court records." And again here, it fails to point to any person in that circumstance who is at issue in this case. The FBI's arguments here would certainly be strengthened if it could point to an instance of private information that should not be released. On the record before us, I view the District Court's order as having properly considered the relevant privacy interests.

71

### b. Public Interest

The FBI argues that the District Court erred in relying on the public's interest in "learning about . . . suspects and subjects of interest in the September 11 attacks" because FOIA is not designed to let the public learn about individual criminal actions. The Majority Opinion reverses the District Court, ruling that this public interest is not so compelling as to favor of disclosure. Maj. Op. at 41–42. The operative question for us is whether disclosure would "appreciably further 'the citizens' right to be informed about what their government is up to.'" U.S. Dep't of Def. v. Fed. Labor Relations Auth., 510 U.S. 487, 497, 114 S. Ct. 1006, 1013–14 (1994) (quoting Reporters Comm., 489 U.S. at 773). I believe the public does have an interest in knowing what, if anything, the government knew about the al-Hijjis in the run-up to the 9/11 attacks, as well as how the FBI handled its investigation of the al-Hijjis' departure from the country.

The Majority Opinion is right when it says that it would have been insufficient for the District Court to rest its assertion of a public interest wholly on the supposed interest in information about "who may have been involved in the 9/11 attacks." Maj. Op. at 41. But the District Court did not limit its analysis in this way. The District Court also weighed the "significant public interest . . . in learning about the FBI's investigation of the Al-Hijjis", specifically whom the FBI

72

investigated and how that investigation was conducted. These interests strike me as weighty enough.

The FBI does a disservice by comparing the public interest in this case first to Nadler and then to Reporters Committee. Nadler addressed a claim by a former judge seeking to learn the name of the informant who alerted authorities that the judge was accepting bribes. Id. at 1482–83. The information sought by the Bulldog in this case is thus hardly alike the "conduct of private citizens" at issue in Nadler. Similarly, Reporters Committee addressed a purported public interest in a person's past arrests and convictions, no matter how small or long ago. See 489 U.S. at 774–75, 109 S. Ct. at 1482–83. Unlike past incidents that may line an individual's FBI rap sheet, the public is not likely to "forg[et]" about the 9/11 attacks any time soon. See Maj. Op. at 38. Suffice it to say that the 9/11 attacks were a pivotal historic event and the government's investigation of those attacks continues to generate great public interest.

The FBI also argues that the large amount of public information disclosed about the 9/11 attack means there is little marginal interest in the release of this additional material. This argument does not persuade, because this case has generated public interest in its own right. It involves a specific finding of fact by a Congressional Commission and has been publicly called into question by a former U.S. Senator who served on the 9/11 Commission. The FBI contributed to this

public interest in the case when it publicly disputed the Bulldog's initial 2011 article on the al-Hijjis. Therefore, even when evaluating the "public interest . . . in light of all that is already known," there remains sufficient public interest in the disclosures ordered by the District Court. See Mordenti, 331 F.3d at 804.

### c. Balancing

In addition to the arguments discussed above, the FBI generally asserts the District Court erred in balancing the relevant interests under Exemption 7(C). This argument is again undercut by the FBI's persistent failure to point to the specific redaction decisions with which it disagrees. Nevertheless, the Majority Opinion says the balance cuts in favor of nondisclosure because the Bulldog has failed to establish a significant public interest under FOIA. I do not agree with this ruling. I would affirm the District Court because I believe there is public interest in the materials sought by the Bulldog.

## II.    EXEMPTION 7(E)

My other area of disagreement is with the Majority's analysis of certain redactions under Exemption 7(E). This exempts from FOIA disclosure those records or information compiled for law enforcement purposes, which if produced "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention

74

of the law." 5 U.S.C. § 552(b)(7)(E).  My disagreement with the Majority Opinion's application of Exemption 7(E) extends to Document 22 only.

Document 22 is an April 2014 PowerPoint slideshow entitled "Overview of 9/11 Investigation."  I agree with the Majority that Slides 56 and 57, which generally discuss certain facts about the investigation into Walid bin Attash, should be disclosed, as they do not fall within Exemption 7(E) (or Exemption 5).  I also agree with the Majority that consideration of Slide 13, which contains a grainy photograph taken by a security camera in an unknown location, should be remanded to the District Court in order to permit the FBI to supplement the record with additional details about the camera.  However, I do not agree with the remainder of the Majority Opinion's rulings on Document 22.

Slides 19 and 20 contain certain findings of the FBI's investigation.  The FBI has redacted particular bullet points discussing information relevant to the 9/11 hijackers' finances and identification.  The FBI and the Majority Opinion say redaction is appropriate because these bullet points reveal how the hijackers could "stay 'under the radar'" and that disclosure would enable future suspects to employ these "undetected methods."  This explanation sounds reasonable on the surface, but is undercut by the production of the other portions of these slides, which demonstrate how the hijackers "Adapted to U.S. Society" and the communication

75

methods they used to avoid detection.  The FBI's position in this regard is not consistent.

Next, the FBI redacted everything but the title of Slide 24, which concerns when the 9/11 pilots and intended pilots arrived in the United States.  Similar content has been redacted from Slides 31 through 36, which discuss the activities of the hijackers in the months leading up to 9/11.  Because these slides are pure factual recaps of generally known topics of interest without any discussion or analysis of law enforcement techniques or intelligence gathering, they too should be disclosed.

Four additional slides—Slides 29, 30, 37, and 47—discuss the hijackers' finances.  But like the slides containing the historic information outlined above, these slides contain no analysis, no discussion of techniques, and no explanation of how the conspirators avoided detection.  Notably, the FBI recognizes that "it is common knowledge" that it would investigate the conspirators' financing.  As a purely factual recap of the crime, these slides should be disclosed.

Finally, the FBI has redacted everything but the title—"Ongoing Investigation"—from Slides 55, 58, 59, and 60.  The FBI argues these slides should be redacted because they discuss "investigative leads and the sources of data the FBI finds useful" and "investigative leads derived from forensic analysis." But it is not clear from this explanation what "techniques and procedures" or

"guidelines" would be revealed by disclosure. Given that these slides indicate they discuss ongoing investigations, there is some risk that release could lead to circumvention of the law, so I would remand consideration of these slides to give the FBI an opportunity to explain to the District Court the techniques and procedures at issue.[4]

The Majority Opinion says the redacted material in these slides "reveal the data considered relevant by the [FBI], the specific factors considered in the investigation, and the commonalities and patterns detected (and not detected) by the [FBI] when analyzing the data," thus warranting protection under Exemption 7(E). Maj. Op. at 55. But the Majority does not explain how this is so, beyond its conclusory statement that "almost all of these passages expose aspects of the [FBI's] investigative and analytical methodologies." Id. I worry that this cursory analysis of the connection between these slides and the FBI's claimed techniques and procedures could allow government agencies to redact all factual information

---

[4] These slides are now indisputably old. What might have been an ongoing investigation at the time the slides were produced may no longer be ongoing. Also, the FBI redacts these slides under Exemption 5, which permits withholding of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Material withheld under this exemption "must be . . . a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." Miccosukee Tribe of Indians of Fla. v. United States, 516 F.3d 1235, 1263 (11th Cir. 2008) (quotation marks omitted). While the slides outline some general topics of ongoing investigations, they do not appear to be related to any legal or policy matter. At the very least, that information is not "a direct part" of a policy decision-making process. See id. (quotation marks omitted). I believe that redaction of these slides under Exemption 5 is not appropriate and would not let it stand in the way of a remand to the District Court. The Majority, meanwhile, does not reach the issue. See Maj. Op. at 60.

gathered in the course of any investigation as potentially revelatory of confidential strategies.  That said, I understand there are circumstances in which such information <u>could</u> overlap with law enforcement techniques and procedures.  For example, in <u>Allard K. Lowenstein International Human Rights Project v. Department of Homeland Security</u>, 626 F.3d 678 (2d Cir. 2010), the Second Circuit posited that Exemption 7(E) could be used to block release of information pertaining to the subjects of an investigation, if such information could reveal the scope of the investigation.  <u>See</u> <u>id.</u> at 682.  But the FBI has made no such argument here.  Again here, the FBI claims only generally that disclosure of financial information could reveal "how much money one can move around, what form is more or less detectable, through what means, and where to avoid so as not to attract attention," and that information about vulnerabilities in U.S. airports "would provide a criminal with insight into how to successfully plan future criminal acts without detection."  These arguments are too broad to persuade me regarding the information at issue in these slides.  I would not permit redaction of these slides.

\*  \*  \*  \*  \*

I am well aware of the difficulty of balancing the public's right to know what its government is up to, and the government's right to secrecy.  I commend the Majority Opinion for its treatment of these sensitive topics.  Nevertheless, I do

78

not believe the FBI has made a sufficient legal case for all the redactions the

Majority permits.  I therefore respectfully dissent as set forth above.